Number 18-1212,Curto versus ACountryPlaceCondominiumAssociation,Ms. Park and Ms. Costigan. May it please the Court, Sondra Park for appellant. I'd like to reserve three minutes for rebuttal. Fine. The Condo Association CPCA enforced a pool policy that explicitly segregates based on sex. Seventy-two percent of pool time is set aside either for men or for women. And just 15 percent of pool time, Sunday to Friday, is open to people of all genders. The schedule bars men, like Mr. Lusardi, from swimming with his wife most of the time as part of her medical therapy. What are the number of hours for one gender and the hours over the course of a week for the other? Your Honor, the number of hours for – well, there's a slight difference between the two schedules that were enacted in the summer of 2016. But generally speaking, there were about 33 hours for women and 32 hours for men in the later half of that summer. And that's with respect to women-only or men-only hours. And then there were 25 hours for all gender times. Is that a concern over the entire – the total number of hours, or is it certain periods of the day, or is it certain days of the week? It's with respect to the sex segregation throughout the schedule. I think there are two layers of discrimination. One is the facial classification, setting aside certain hours for men and women. And then certainly there's an issue of unequal allocation of those hours. For example, with Ms. Curdo, as a working woman, Monday through Friday, there are essentially very few hours after 5 p.m. designated for women. And so if you compare that 5 p.m. period, there are almost five times more hours for men after 5 p.m., Monday through Friday, compared to women. And then there's a broader issue, I think, that really speaks to the heart of the Fair Housing Act. Let me just add a question. Oh, I'm sorry. On your more fact-specific issues, I – look, did you preserve the arguments about the qualitative differences between the men's and women's hours below? Certainly, I believe so, Your Honor. Where? We talked specifically about Ms. Curdo. I can look back at the record. Counselor, my recollection – correct me if I'm wrong – is that you mentioned them in the statement of facts, but you didn't make them in the arguments section. I believe we ordinarily treat things that are merely mentioned in the facts statement, not made as arguments, as waived. Is there any compelling reason we should overlook those waivers here? Well, Your Honor, I would – I don't believe they're waived, but I also think the schedule speaks for itself in terms of seeing how the hours are allocated between men and women and exclusion of women from those evening hours, Monday to Friday. I'd also note that I think that there's a deeper issue, a more fundamental issue, in terms of – under the defendant's argument, there are many fewer all-gender hours in this schedule than in the women-only or men-only sets of hours. And that, I think, speaks to a more fundamental issue of the Fair Housing Act, which is intended to integrate communities with respect to all the protected classes, including race and sex. We have to consider the Fair Housing Act as amended by later statutes. And you argue that RFRA, the later Religious Freedom Restoration Act, was waived here. But it seems like the condominium raised the issue of religious burden at multiple points in the case. And the Second Circuit in Hengens v. Light found that RFRA applied to construing the statute. Since the religious burden has been put factually an issue, wouldn't it be best for us to remand this case and have the district court address all the RFRA issues in the first instance? Your Honor, to take those questions in turn, I do believe that the defendant waived the RFRA claim here. The defendant waived the RFRA claim under the Second Circuit's analysis in Hengens v. Light? Yes, I do think so, in that RFRA was not even raised in the brief, unlike in Hengens. In Hengens, the appellee explicitly disclaimed reliance on RFRA. And yet the Second Circuit said, you can't distort the meaning of a federal statute even by disclaiming it. We're still going to demand to apply the law as written. So RFRA is not just a defense, it also colors the way we interpret the Fair Housing Act. If that wasn't a waiver, why is this a waiver? I agree, but the RFRA defense can be waived, as a number of the cases that we cited in our brief concluded, that it's not an automatic, that simply because religion is mentioned below, that RFRA is somehow waived. Are you familiar with Hengens? Yes, I am, and I understand. Hengens said, if you don't mention religion, of course it's waived, right? And a number of your cases are dealing with that, efforts to inject religion at a late stage. As I read the record, religion was mentioned in the district court repeatedly, and I don't take you to be disputing that. If it was mentioned on the face, then this case looks more like Hengens than the ones on which you're relying. So why isn't the prudent course to let the district court take the first crack at this? So with respect to how religion was mentioned below, it was always in the context of the Fair Housing Act disparate impact defense that defendant has raised. It was all in the language of discrimination. There was no discussion of substantial burden, as RFRA is a test of, which I think contrasts it. When you compare the RFRA elements with the disparate impact under the Fair Housing Act elements, those legal standards are quite different, and plaintiff was not on notice below that RFRA was going to be an issue at this case. And even in asking for more time on supplemental briefing, the parties acknowledged that this would require time, substantial research by the parties, because none of these issues were researched below. Was there any argument in the district court regarding any burden on religion, any argument made to the district court? No, Your Honor. The only argument with respect to religion that defendant raised was its argument that if it adopted a gender-neutral pool policy, it would face disparate impact liability based on religion. Do you know if the district court considered religious freedom or RFRA in its opinion? It certainly did not, Your Honor. That was nowhere mentioned. It was nowhere mentioned in any of the pleadings. And even the affirmative defenses that the defendant points to in alerting the court that it believes it did raise RFRA, all of those affirmative defenses specifically cite the Fair Housing Act or the New Jersey Law Against Discrimination and use the language of discrimination. They do not use the language of substantial burden. All right. Let's talk about the Fair Housing Act's treatment of religion and discrimination. We have this issue about whether RFRA is in the case or not, and you've got waivers on your side and they've got waivers. We have to sort that out. But the Fair Housing Act also has Section 3607, which has a religious exemption in it. Now, that is not directly in play, but it might cast light on how we put Fair Housing Act and RFRA together. And I believe that statute says a religious organization can favor a member of its own religion over other religions unless membership in such religion is restricted on account of race, color, or national origin. So that provision distinguishes between religious accommodations that are trumped by race, color, or national origin. But it doesn't say that about the other protected categories. What do you make of the fact that sex is not included in that list, and should it bear on how we interpret the Fair Housing Act? I think that that exemption is appropriately tailored to allow for favoring of co-religionists in choosing who is admitted to housing. But that exemption does not authorize religious organizations to then discriminate in any other basis, including based on sex, in other aspects of the provision of housing. And so I think that the exemption needs to be interpreted in the context in which it's raised, which is favoring co-religionists when you're talking about admission to housing, but not in other contexts with respect to terms of housing. Go ahead. Why don't you finish up? No, no, no. It's not on that. It's a different topic if you want to go further. Yeah, I was going to go to a different topic as well. On the Federal Housing Act, the Fair Housing Act, FHA, is your argument that there can be no single-sex swimming hours acceptable? Well, our argument here, Your Honor, is that in terms of facially segregated sex hours, that that is not permissible under the Fair Housing Act. So a single hour for devout Muslim women, whose understanding of modesty is that they shouldn't be unclothed at all with men, even one hour for each sex in the middle of the day, under your reading, would violate the Fair Housing Act? Your Honor, yes, because there is no exception for de minimis discrimination under the Fair Housing Act. Let's say that there's a bathroom. There's a men's bathroom, which women are not allowed in, and there's a women's bathroom in the lobby. Facial discrimination on your account. The Fair Housing Act, on your reading, forbids single-sex bathrooms then? No, Your Honor. We're certainly not arguing that, and we don't think the outcome in this case, even if the court were to rule that this schedule violates the Fair Housing Act, would lead to that. Where do you draw the line then? Well, one point I would make in the context that Judge Bevis raised is that there are bathrooms available to both sexes at all times in that context. Okay, let's talk about this building. Imagine that this is an apartment building. On the seventh floor, there's a judge's gym, but there's only one locker room. So the judges take turns, and sometimes the men are in it, and they slide a sign, so it's men only and sometimes women. If this were an apartment building, would this court be violating the Fair Housing Act because there's not a separate men's and women's locker room? No, Your Honor. I think that that context is different in that one of the problems with allowing for the pool schedule that stands here is that it sends the stigmatizing message that people are excluded from that pool based on their gender. Was there no stigmatization in the bathroom or locker room context? So historically, there has been a custom of allowing sex-segregated bathrooms in locker rooms, and in part, I think that those separate facilities have actually furthered women's opportunities in that allowing for women's bathrooms in the workplace or women's locker rooms in an athletic facility allows for women to participate in those contexts. Historically, there have been times at pools where only youth can be there, only senior adults can be there. I mean, once again, where are you going to draw the line? Well, Your Honor, I look to the statute, and I think that under the Fair Housing Act, it treats those protected classes the same. So when you're talking about sex or race, those contexts are treated the same under the Fair Housing Act. And so to the extent that we would not allow for separate hours for people of different races or different religions or different national origins, that same reasoning needs to apply in the sex context. We're not dealing with a constitutional context where there are varying levels of scrutiny. I don't understand how you've distinguished the bathrooms context, then, unless what you're saying is discrimination against does not forbid it when it doesn't disadvantage one's sex. Is that what you're saying? I think that is part of the reasoning that has been adopted by, for example, the Supreme Court, thinking about equal opportunity for women. Okay. So you're picking up, then, on language in Ritchie v. DeStefano that says disparate treatment is when a defendant treated a particular person less favorably because of protected trait. Do you embrace that as a definition of discriminated against in the statute? No, I think that here we have a facially discriminatory statute that is at any given moment of day. You mean a schedule is discriminatory? Sorry, a schedule, right. At any given moment of day, someone's access is totally determined by what gender they are. And I think that- Do you think there's a greater expectation of privacy in separate gender bathrooms as opposed to being in a pool where people are, in fact, together? I do think that there is a social custom with respect to that. There is a social custom with respect to bathrooms. And I also think that in the pool context, what this type of schedule is doing is advancing legal or social inferiority based on gender, that Ms. Curdo cannot ever swim at 7 p.m. in the evening during the work week because she's a woman. So then it would be enough for us simply to not allow disparate numbers of hours in the evening, but to say if they were equalized, then that might be a different case. Well, no, Your Honor, because I do think that one of the fundamental principles of the Fair Housing Act is integration along the social classes, along the protected classes, which includes sex. And so I don't believe defendant's argument has it all accounted for. How do we promote integration if we are allowing for separate sex-segregated hours at different times? I just don't understand, then, how we shouldn't be integrating bathrooms and locker rooms. You haven't drawn a real line between those things and the pool. I do think that there is a social custom with respect to that, and the history of those facilities have been about furthering opportunities for women in those contexts. In the pool context here, it is shutting out people from accessing the pool, and particularly because we're dealing with just one pool, with respect to their gender, that they simply are shut out. And that's a stigmatizing harm that laws like the Fair Housing Act were intended to prevent. Looking at the pool schedule, some days from Friday, it looks like, let's see, seven days a week, the women have access to the pool, women only, 8 in the morning to 11 p.m. That's three hours, seven days a week. Yes. Is that accurate? Yes, except for Saturdays, all residents have it during that period of time. Now, you claim that the problem with women's use of the pool in the evening is that those hours are reserved mostly for men, because the women work, they get to the condo very late and don't have access to the pool. That's fairly accurate. But they have three hours every day in the morning, from 8 to 11 a.m. Doesn't that address the concern that you're raising about women not having access to the pool in the evening because they come home late? No, Your Honor. I mean, I think if someone's working a typical 9 to 5 schedule, they're not going to be able to access the pool during that morning time. But I also want to note that there's a separate interest of our clients, the Lusartes, who are a heterosexual married couple and who want to be able to swim together, and there are only two hours a day, Sunday to Friday, that's set aside for them. I mean, I gather they may have moved out, but let's assume that that's not the issue here. I see what your complaint is about Mrs. Lusarte, but there's a fine at issue. Let's imagine either they remove the fine or we strike down the fine or something. Let's say there's no fine. How does Mr. Lusarte have standing? Mr. Lusarte has standing because he similarly wants to be able to access the pool and is barred from doing so because of his gender. Disadvantaged because of his sex. Because he would want to swim at times that are set aside for women with his wife and is barred from doing so because he is a man. And, in fact, that is one of the fines that arose in this case, that he was present at a women's time. But the Ritchie versus DiStefano definition of discrimination is whether it has treated a particular person less favorably than others because of a protected trait. Has he been treated less favorably than women because of his sex? I think that the – I would point the court to language such as this court's decision in Wingap. The protected trait, by definition, plays a role in the decision-making process, and that is what's happening here where Mr. Lusarte, if he goes during a women's hour time, he is simply barred or he will face penalty for trying to access the pool at that time. Is there any policy you can think of whereby the association could adopt what would allow Orthodox members of this community to have some time when they can be in the pool commensurate with their religious beliefs? Your Honor, I appreciate that question, and defendant never explored those options. I do think it's possible that there would be a facially neutral under the Fair Housing Act type policy that could comply with that act. For example, there could be a reservation system. Of course, it would have to be looked at very carefully to ensure that the implementation complied with the Fair Housing Act. But none of those types of options were explored here. Instead, the Condo Association immediately adopted a facially sex-segregated schedule and over time increased those hours such that now there are only two hours of all-gender hours available Sunday through Friday. But would you be open to some sex-segregated schedule depending on the hours of the day? No, Your Honor. Our position here is that that facial classification based on sex violates the Fair Housing Act. It sounds like it's a binary decision. It's one way or the other. Well, I do think the court has the option of looking at this particular schedule. Of course, this is a schedule that's before the court and finding that it's unequal under the Fair Housing Act. As I understand it, the sex-segregated hours started back in maybe 2011 or so, a while back, and there were many fewer at first. I don't believe your client filed suit for several years after that. Would your client be satisfied with some compromise that went back to what they were before your client filed suit? Before 2015. Your Honor, at this point we are before the court asking for a declaration that this schedule violates the Fair Housing Act. I agree, and I do think that in many contexts more limited hours will not give rise to liability or lawsuits as the schedule earlier on did not. But the fact is that we are now before the court on this 2016 schedule and asking for a declaration that this is in violation of the Fair Housing Act. You see no accommodation for a men-only schedule? I'm sorry? You see no accommodation for a men-only schedule, regardless of the hours, regardless of the days of the week? Your Honor, yes. In terms of a specific sex-segregated facial schedule, our position is that does violate the Fair Housing Act. So you're going to home plate and you're either going to hit a home run or you're going to strike out. There's no singles, there's no doubles, there's no triples, right? No, Your Honor. We think that this is a very specific schedule that's before the court. But your response to the question is, is there nothing that can have some type of sex segregation with respect to pool use because two-thirds, at least, of the condo association believe in conjunction with their religious beliefs that there should be this segregation. And you're saying, too bad, you can't have any kind of balancing here. It's all or nothing. Well, I think Congress set out the parameters of the Fair Housing Act. They do not fall under the religious exemption. And it's clear that this schedule discriminates based on sex because of the ways the hours are set up facially. So you're saying the Congress draft is something that's, by some people's thinking, is so stark that there's no room for maneuvering? None? Zero? No, no. I think I offered to the court earlier that I think defendant could have explored facially neutral options, and that was not something that was ever explored. Instead, they took this route of adopting hours that exclude people of all genders most of the time from accessing the pool. So other than maybe asking for a permit, as you were talking about earlier, what would be other facially neutral options? At this point, Your Honor, I don't have any other suggestions. I would urge the Condo Association to consider those options moving forward. You said that's options plural. You gave me one. What other ones might you suggest? Oh, I'm sorry. I only refer to the reservation option. All right. Why don't we hear from this? Go ahead. I'm sorry. Go ahead. I wanted to ask you a question about your – you suggested that we adopt a 10-circuits view that would permit discriminatory practices if justified by public safety concerns or if they benefited a protected class. Is that correct? I'm curious how that would work here. Sure. Your Honor, I do think under WINGAP, given that this is a facial classification, that can qualify as per se discrimination. That would not require – or that would not then look to a next step of justification analysis. This Court has not yet addressed that specific issue. To the extent that the Court wants to adopt an analysis that looks at justification, I agree with your question that you should be looking more to the precedents from the 6th, 9th, and 10th and not to the 8th, which adopted the standard from equal protection. In terms of the 10th, the safety concerns obviously have never been raised here or are not at issue here. In terms of the benefit for promoting integration and equal housing opportunity, I submit that this schedule simply can never meet that test because what they are doing is facially classifying based on one protected status in order to purportedly help based on another protected status. And that just furthers discrimination, does not promote the interests of women, as Ms. Curdo very vividly illustrates. Sorry to use this example, but what if they had two pools, one for men and one for women? Your Honor, we would still submit that that is sex segregation based on sex. I don't think that they could feasibly do that in this context, but even if they did, that would still raise the same questions that we're grappling with here. Thank you. Thank you. Thank you. Thank you. Good afternoon. My name is Angela Koskogin. I represent the Country Place Condominium Association. Thank you for listening to our case. I'd like to start with asking the court to affirm the decision of the district court. We believe the district court not only applied the facts correctly, but applied the law correctly as this circuit should as well. You say the case, at least your briefing argued, it wasn't because of sex, but how can you get around the fact that a person walks over to the pool, wants to swim, and is told the only reason you can't use the pool at this time is because you're sex? Well, I agree that sex is the mechanism by which these people swim in the pool, and the only reason that is is because of their modesty regulations. They're Orthodox Jewish. You seem to be saying because the motivation isn't invidious, but this is a facial classification based on sex. It's disparate treatment. But for being a woman, Mr. Losardi would be let into the pool.  I understand Butler is not a disparate treatment, disparate impact case, but starting with Butler going to Wind Gap and most recently in Boyertown, states that the test is not simply a but for a test. The test is whether or not, first, there was discrimination, and secondly, was it because of sex? Well, let's talk about discrimination. How do you understand the statutory phrase discriminate against? Doesn't this disadvantage Ms. Curdo in the after work hours discriminate against her? Is that disadvantage enough to make it discrimination? I do not think so, Your Honor. I believe that Ms. Curdo, by her own testimony, indicated that she moved into this community because it's a 55 and over community, and she wishes to retire here. Ms. Curdo has two days of the week where she can swim in the evening, and her testimony is clearly that she does swim in the evening at least two days a week. I believe if the plaintiffs are requesting additional hours, that also means that they concede the fact that this schedule does not violate the FHA, but simply needs to be tweaked on the hours. Can I ask you a question about the schedule itself? I'm looking at the schedule from Monday through Friday, which is the normal work week, and I counted the hours that the women have use of the pool and the hours that the men have use of the pool. I've come up with male, men, 17 and a half hours during that same period, five to nine, weekdays, women, three and a half. Can you justify that? Well, what happened was, Your Honor, is that the board set up a committee back in March of 2016. At that time, Ms. Curdo was part of that committee. This is the 2016 schedule that's currently in effect. Yes. As part of that committee, they were tasked with actually figuring out what hours would best suit the needs of the entire community, and the committee did not. So the board took it upon itself to formulate this schedule, taking into account everyone's needs, allowing everyone to swim on a daily basis in order to accommodate the Orthodox and to accommodate the non-Orthodox. Are you suggesting that there was input from all of the residents of the condominium in the preparation of the schedule? I am suggesting that, yes, Ms. Engelman did testify that there was a poll taken, and 200 of the residents chimed in on the fact that these hours would be somewhat beneficial, but mostly chimed in on the fact that they needed to have separate hours so the Orthodox could swim. We have a federal statute here, right? This is not just government by the majority, right? We have a statute that speaks to this. What we have to do is figure out what the statute means, and you've also got a problem of a regulation here. So the statute says just discriminate against, but the regulation says limiting the use of facilities because of sex. Is there any way that this isn't limiting the use of the facilities because of the sex? To win, do you have to say that the regulation goes too far under the statutory language, under Chevron? I do not believe so, Your Honor. I believe that in order to find for the Orthodox, I believe this panel needs to find that they were not disadvantaged, that they weren't treated any differently or less favorably than anyone else, and I believe it meets that test. I believe in this pool, everyone swims every day. The men swim. The women swim. Everyone swims together every single day except for Saturday when it's the Orthodox religious holiday, and everyone gets to swim. Of course, if you're a working woman, you're going to have trouble using that pool, aren't you? Two days of the week, a working woman could use the pool, but as Your Honors pointed out, this was not raised below. You get three and a half hours in the evening, and the men get 17 and a half hours. You don't think that women who work are disadvantaged? I do not believe this particular woman is disadvantaged. I believe that it's not a sex stereotype case. I believe Pricewaterhouse was clear as to the guidelines when we're talking about it. It's not a question of motivation. It's a question of how it plays out. Seventeen and a half versus three ain't quite equal. Well, according, if we tally up all the hours, Your Honor, it is almost equal, and the women actually get to swim more than the men. So the best argument for your side is that this is waived, because you're in real trouble if it's not waived. But you've got to waive a problem, too, which is the RFRA arguments. I mean, this associational standing here, we don't have a board resolution. We don't have an organization that has taken on a religious identity. We have different members of the organization fighting about what it really means or stands for. So it seems like your best argument isn't really developed here. That's a problem for you. Why should we even reach it or do anything further with it? I submit to you that the lower court did not need to reach it because they found no discrimination under the FHA. Let's say we find it because of seventeen and a half versus three hours, right? Your adversaries, that's their best point. Their best point is these are qualitatively different. Let's assume we find that's not waived. Then you're kind of stuck, okay? So then what do we do about RFRA? I don't agree that there was any waiver here. I believe it's in Affirmative Defense Number 22 and Affirmative Defense Number 24, 25, 26, 27, and 28 in the amended answer. You never mentioned RFRA, did you? I did not, no. And it's not mentioned on appeal in any brief. It was mentioned in the brief, I believe, that we wrote to the district. On the supplemental brief when we asked about it. But it was not mentioned at all. Actually, the district court mentioned it in its data facts. They indicated that 80 percent of the Orthodox in this community were Jewish, and in order to accommodate the Jewish Orthodox is why we got the pool schedule. As far as the waiver argument. It's one declaration or deposition, right? You don't have a survey. You don't have board resolutions. You don't have any more formal discussion of this. I submit to you that pursuant to Kamen v. Kemper, this court, along with any other court, can raise any issue, any statute, any rule that it seems fit to decide a case, and RFRA perhaps would be the way to decide this case. Looking at the schedule, it's very clear that, to me at least, that men and women are treated differently in the scheduling. Why isn't that a per se violation of the Fair Housing Act? Because men and women are not treated differently. Men and women are treated the same with reference to the hours in the pool. For example, we have the men swimming 64 percent of the time in total. That would be 36 percent by themselves and 27 percent with the women, and the women are swimming in the pool 65 percent. That would be 37 percent by themselves and 27 percent in the pool. How does that address access? Excuse me? It's still gender separation. It's treating men and women differently for purposes of scheduling. But not less favorably, Your Honor, and that's the test. You have to treat them differently or less favorably. This is back to the statute reg issue. Under the statute, you might have an argument based, if we follow the Supreme Court Ritchie v. DeStefano, discrimination against means treating worse, right? Your adversaries say, does that separate but equal? Is that consistent with brown and loving? And the reg seems to take their side on this in suggesting that, you know, if you're limiting use of facilities because of sex, that's enough. All right? So how do you deal with the reg? Well, I submit to you they raised the case of loving, but loving was a miscegenation case. Loving was an animus case. We have no animus in this case, and loving was, according to the court, pure and simple racism. Well, that raises a point, though. Let me ask you this. For instance, if we take your schedule and instead of saying women only and men only, we changed it to African American only and white only, is that discrimination? No, Your Honor. I submit to you that that issue has been raised repeatedly in all of the cases, specifically in Ocentro. Well, you can have separate hours depending on race, as you do here depending on sex. Well, I think it's a slippery slope, and I think that the courts have repeatedly – The minute you get to the top, you go to the bottom real quick. I think the courts have repeatedly – our Supreme Court has constantly discussed the slippery slope that is always argued in these cases. And in Ocentro, I think Justice Roberts put it very clearly in that you have to examine the entire context of the case and decide which side would win based on the entire context of the case. Do you know of any practice that you can point to – this would be a two-part question – of segregating public pools or beaches by race? Do I know of any? Not that I can account for. Do you know of any whereby you can do the same thing by gender? I don't know of any, no. So why are you trying to do it here? We're not trying to do anything here. What we're trying to do is allow everyone to swim in the pool. Pursuant to the FHA, they espouse continuity. They espouse that everyone should get along, that everyone should be able to have housing, which is what we try to do here. We try to allow everyone to swim. You're still under the Fair Housing Act treating men and women differently. And, of course, I asked you about the race, but you're still treating – isn't that per se discriminatory? No, and I think that was addressed in the Wingap case in this circuit. I think that's a very illustrative case, even though that was a proxy case. In Wingap, the court discussed disparate treatment, I believe, very clearly, and the court indicated that the because of factor is often overlooked. There is a test necessary in order to show discrimination. I don't believe the test has been met in this case. In Wingap, this circuit went through the different categories that must be analyzed in order to find discrimination under the FHA. One of them is to look very closely at the reason, even though animus is not required. The second is to look very closely at the context. Well, let me ask you the question and ask your adversary. So we have a specific provision in the FHA, 3607, that says religion can't trump race, ethnicity, and national origin, right? It doesn't mention sex. The difficulty you have is that you don't qualify for the 3607 exception. You haven't pled it. You don't argue it. This isn't just a religious organization that's doing it. Does that cast any light on how we should put this statute together with RFRA? I believe it does, Your Honor. There's no argument that we're not a religious organization pursuant to the FHA. It wasn't set up as such in the state of New Jersey, and we're not pleading it here. But in conjunction with RFRA, RFRA provides for religious accommodations. As Ocentro stated, RFRA provides for a very vast and broad religious accommodation, and it must be read in that manner. The way to mesh these two cases is that the – and I think the National Housing Amicus Brief brings that to your attention. I think the way would be that the FHA provides for exemptions for religion. In fact, religion is a protected class in the FHA. Also, it provides for religious organizations. It provides for many exemptions, and I ask that pursuant to RFRA, if the court reaches RFRA, this should be an exemption. Let's decide we go that route. You've got an issue. How do you show associational standing? Is there enough in the record below to show the condo association can bring a RFRA claim on behalf of its members? Because it certainly wasn't framed that way, but is there enough in the record? Or do we demand for more fact-finding? What do we do about saying that you've got associational standing here if you want a RFRA claim? I think you have enough in the record to show that we have associational standing. You've got to show that the religious rights of the Orthodox members are germane to the purposes of this condo association. Where is that noted anywhere in the condo association formation documents? It's not in the formation documents. I submit that's correct. However, there are approximately 260 unit owners who voted for this entirely Orthodox Jewish board and this entirely Jewish Orthodox board... At least 30% to 35% or so is non-Orthodox here, right? No, it's approximately 30% and could be as low as 20% at this point. As Ms. Engelman testified very clearly, three or four years ago, the board had non-Orthodox members. As the community became more and more Orthodox, they elected an entirely nine-member Orthodox panel who works for the unit owners as a group. That's what the law says in New Jersey. The association is implemented... But you have to show for organizational standing that the religious rights of the Orthodox members are truly germane to the purposes for the formation of this condo association. How can you possibly show that? Under Hunt, I believe it's possible in this case. Hunt is the one that sets out the test here. How does Hunt help you? Well, in Hunt, we have to look at Hunt. Hunt was a case involving apples in the state of Washington and it was an associational group set up by the government to make sure that the apples went to everyone it's supposed to go. In Hunt, the court was very clear that you don't have to show a vast association, something germane to this body, but you have to show some indicia, which is what we have here. We have enough facts to show that this board works on behalf of 376 members and 260 of them voted for this Jewish Orthodox board in order to make sure their rights were protected. But wasn't the purpose of Hunt is for everybody to sell, you know, in this group, to sell their apples? They had a common purpose. That's correct. So... Go ahead. The purpose here... Finish that up. So the point being that you've got 30%, maybe you're saying now perhaps 20%, that that isn't part of their purpose. It certainly isn't the purpose that's noted anywhere in writing with respect to the condo association. Well, actually it is. I beg to differ, Your Honor. Where is it noted? Pursuant to the statute. The condo association is a creature of statute in New Jersey. In the statute in New Jersey, the condominium act specifically provides for the creation of associations in order to work for its members. Its only purpose is to work for its members. Its only purpose is to regulate the common elements. And I submit to you that's a common purpose. Could I ask you the same question that Judge Ambrose asked your adversary, which is both sides seem to be going for home runs here. And yet both sides are on slippery slopes. Their slippery slope is they can't really explain why the rule they are asking for won't outlaw, you know, a single hour of time in the pool, bathrooms, locker rooms, the work. Your problem is you've got no check on tiering of the majority here. You're not going to stop until it's just, well, they can have, the Gentiles can have Saturday and our residents get everything else, right? Why, if this didn't get to this point until 2016, is there a compromise position that goes back to some of the much reduced hours pre-2016 that leaves plenty of evening hours open, et cetera, that doesn't involve just saying the majority of Orthodox Jewish residents can vote for whatever they want with no respect for the interests of the non-Orthodox ones in some even-handed, neutral, qualitative, and quantitative way? I believe this pool schedule actually takes everyone into consideration. Let's say we find it doesn't. Let's say we're troubled by the qualitative differences and we overlook the waivers, which is an issue. It would have to be a compromise, Your Honor. I believe, pursuant to RFRA, it needs to be a compromise in this case. Otherwise, we're going to have 376 members not swimming in the pool. We're going to have at least 275 Jewish Orthodox members who are going to be precluded from swimming in a pool, which is their right. I believe, pursuant to RFRA, which is a broad statute, this is a religious accommodation, a classic case of a religious accommodation, and I believe it's provided for both in the FHA and the RFRA. Is it your position that the women's hours in the initial 2016 schedule and the amended 2016 schedule increased or decreased or remain the same? No, actually, the women's hours increased in July 2016. They put in an amendment which gave the women .75 hours more. Let's assume that we actually could possibly get to the climb to many hills you would need to climb in order to have a RFRA being considered. We'd have to get past waiver. We'd have to get past associational standing. We'd have to get past the fact that this is a private suit that doesn't involve the government and circuits have got this split on whether the government needs to be involved. Let's assume we actually get to the merits if strict scrutiny. Isn't it a compelling interest to have under the FHA that you have equal access to the housing facility? Isn't that a compelling interest? I submit to you it's not. I don't think there's a compelling interest here because the FHA provides for many exclusions. It provides for exclusions. Unless you have four units or not, one has to be owner-occupied. It has exclusions for religious organizations. It has many exclusions. But there's an equal opportunity to participate without regard to sex, gender. That's basically what it is. It is, but it also provides. And the regulation says no limitation. The FHA also provides for housing for everyone. It prevents segregation, which is exactly what we're trying to prevent here. We're trying to prevent the Orthodox Jews from staying out of the pool. And they're saying just the same thing but from the other end of the pipe. And if that's the case, it would seem that this cries for a settlement in some way, shape, or form. Your Honor, if I may, I actually believe that the plaintiffs are trying to ask this court to adopt the blind theory, which several of the circuits are now applying in the sexual orientation cases and the transgender cases, which is simply not the law in this circuit. By the way, what happens here with transgender people? Excuse me? What happens if a person is transgender here? I don't think it would matter. I think pursuant to Boyertown, it doesn't matter if you're transgender or cisgender. I think you get to swim in the pool. At all times? You get to swim in the pool according to what you identify with, if that's the way I read Boyertown. So if you're transgender, you identify as a man, you swim. If you're transgender, you identify as a woman, you also swim. And that's the beauty of this schedule. Everybody gets to swim in one pool, albeit different times, but that's only to accommodate the Jewish Orthodox, which it needs to accommodate in this particular community. Is this sui generis? Do you know of any other condominium association that has adopted rules anywhere near what these are like? I don't know that yet. That has adopted pool rules along gender lines? I know in the past that they've tried to adopt rules with reference to children, which is why I understand some of the cases that the plaintiff has brought up. As far as keeping the children out of the pools? I mean, the Lanos case tries to keep the children into four pools as opposed to the ten pools that are on the site. As far as you know, in New Jersey, this is the only condominium association that has adopted rules for the use of its pool along gender lines. Well, as far as I know, this may be the only condominium in New Jersey that also has the majority of members that are Jewish Orthodox, and that would be the reason why we have it. But you're justifying the segregation along religious lines. I'm not justifying any type of segregation or discrimination. I'm simply saying that there's a religious accommodation that we need to make here, and this case would be the case that calls out for that. Thank you very much. Thank you very much for your time. To address a few points that were raised earlier, we did look back at some of the briefing on the issue of the implementation of this gender-segregated schedule. We do think that the discussion in Document 27-3 below, where we talk about the different pool cases involving children and how those were found to be unequal, particularly because children did not access certain pools at certain times, even though they had full access to pools at other times. And then later in that discussion on page, I believe it's 16, when we talk about the implementation and enforcement of these rules, that that was sufficient to raise the unequal application issue. If I have the docket number right, that is plaintiff's statement of facts in support of a motion for submission. It's 27-3, Your Honor. Is that the one that you're looking at? 27-2. What's 27-3? That's the brief that was filed below. I didn't find that in the argument section, but I'll look back. Okay. I want to address a couple of other points that were raised. One, with respect to board authorization, clearly the board was required to get a vote by the membership under its own bylaws. It did not do that with respect to the segregated schedule. And so there really wasn't the input. It did not have that authorization to act in the way that it did in implementing the schedule. And furthermore, I want to highlight that there really was no evidence offered by defendant about the impact, nor even how many Orthodox Jewish residents would wish to swim. And I think that's a crucial fact that we would need to know if we're going to evaluate any of the legal claims based on religious impact. I also want to highlight that any remand in this case would severely prejudice our clients. They are in their 60s and 70s. They wish to live in this association as retirement. They brought this challenge only in 2016 once we had the schedule that we're faced with here. And they've now gone two years where they've refrained from using the pool as they would wish because the schedule in place. And lastly, I think your Honor's discussion with my colleague here about separate but equal really highlights the fundamental issues with this case. Allowing this type of sex-segregated schedule to move forward, there's no way to draw the line when it comes to either any of the protected classes, nor with respect to the fundamental principle that the FHA is about integrating communities. And in discussion of the FHA regulation that's on point, I'd also note that regulation not only talks about limiting access based on sex, but it talks about because of sex of an owner or a person associated with him or her. And I think that really gets at the heart of some of the issues raised here with the Lusartes, where people of opposite sexes may want to be able to swim together, they may be married, they may have children of opposite sexes, and the Fair Housing Act simply does not allow the type of sex-segregated schedule that limits that type of access. Your request then, ultimate request, is that we reverse the district court? Yes, Your Honor. And that would vacate the current schedule, the 2016 schedule, as amended? Is that what you're seeking? We'd like some re-judgment on the Fair Housing Act claim, and then the district court also remanded the state law claims to state court, and so we'd like those to be brought back. You're basically asking for no schedule? We believe it should be a gender-integrated schedule, Your Honor, in terms of access at all times. As a result of this case, it's possible that the Condo Association could take other steps in response. But you're not open to any accommodation at all? Your Honor, the statute does not allow for the type of religious exemption that the defendant has requested here in terms of a facially-segregated schedule. As we've discussed before, there may be another option that they could pursue, but that is not at issue in this case. Counselor, you asked for summary judgment, but you have a 3604B and 3604C claim, and I don't see B is about discriminating and providing services, which is the focus of the argument. I don't see how you can win on C, which is providing notices respecting the sale or rental of a dwelling. Do you concede that the summary judgment against that was proper? Your Honor, we actually don't believe that 3604C was squarely raised below, so we're seeking the ruling on 3604B. Okay. Thank you. Thank you to both counsel for very well-presented arguments, and we'll take the matter under advisement. I would ask for a transcript to be prepared of this oral argument and to split the cost, and I would ask Ms. Parker and Ms. Costigan, if you could come up here and turn off the mics.